The DIPLOMAT LAKEWOOD INCORPORATED, an Ohio Corporation, Appellant,

v.

Patricia Roberts HARRIS, Secretary, U. S. Department of Health, Education and Welfare, Appellee.

No. 78–1852.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1979.

Decided Nov. 16, 1979.

**17.** *See* note 1, *supra.*

George R. Clark with whom Thomas C. Fox, Washington, D. C., was on the brief, for appellant.

Michele A. Goldfarb, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Sil-

bert *, U. S. Atty., John A. Terry and William H. Briggs, Jr., Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before McGOWAN and WALD, Circuit Judges, and PENN,** District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This is an action by an independent nursing home (*i. e.,* one not affiliated with a hospital) with more than 100 beds for reimbursement of certain costs under the Medicare program. At issue are regulations the Secretary of Health, Education and Welfare (HEW) issued in 1972 requiring a more accurate method of cost computation for hospitals or hospital-nursing home complexes having 100 beds or more, and another less accurate one for all independent nursing homes, including those with 100 or more beds. The appellant here lost substantial sums of money in Medicare reimbursement by being forced to use the less accurate method.

An HEW administrative review board for Medicare providers to which the appellant applied for relief concluded that, whatever equities weighed in the appellant's favor, the regulations were binding, and the board denied relief. The district court found the regulations valid and granted the Secretary summary judgment. *Diplomat Lakewood Inc. v. Califano,* 453 F.Supp. 442 (D.D.C. 1978). We find the requirement in the 1972 regulations that large independent nursing homes use a different and less accurate cost-computation method than that demanded of large hospitals and large hospital-nursing home complexes to be arbitrary, capricious and not in accordance with law. We reverse.

## I. BACKGROUND OF THE PROCEEDING

The Diplomat Lakewood Incorporated (Diplomat) owns and operates a 129-bed nursing home in northeastern Ohio which provides care to elderly, infirm patients under the Medicare program, 42 U.S.C. § 1395 *et seq.* (1976).[1] Diplomat's nursing home contains a distinct part certified as a "skilled nursing facility" under § 1861(j) of the statute, *id.* § 1395x(j); that facility provides "extended care services"[2] to pa-

---

* At the time the brief was filed.

** Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Title XVIII of the Social Security Act, Pub.L. 89–97, Title 1, 79 Stat. 291 (1965), as amended. The qualifying age for Medicare benefits is 65, except in a few circumstances not relevant here. 42 U.S.C. § 1395c (1976).

2. Those services are defined in § 1861(h) of the statute:
 (h) The term "extended care services" means the following items and services furnished to an inpatient of a skilled nursing facility and (except as provided in paragraphs (3) and (6)) by such skilled nursing facility—
 (1) nursing care provided by or under the supervision of a registered professional nurse;
 (2) bed and board in connection with the furnishing of such nursing care;
 (3) physical, occupational, or speech therapy furnished by the skilled nursing facility or by others under arrangements with them made by the facility;
 (4) medical social services;
 (5) such drugs, biologicals, supplies, appliances, and equipment, furnished for use in the skilled nursing facility, as are ordinarily furnished by such facility for the care and treatment of inpatients;
 (6) medical services provided by an intern or resident-in-training of a hospital with which the facility has in effect a transfer agreement *(meeting the requirements of sub-section (l) of this section),* under a teaching program of such hospital approved as provided in the last sentence of subsection (b) of this section, and other diagnostic or therapeutic services provided by a hospital with which the facility has such an agreement in effect; and
 (7) such other services necessary to the health of the patients as are generally provided by skilled nursing facilities;
 excluding, however, any item or service if it would not be included under subsection (b) of this section if furnished to an inpatient of a hospital.
 42 U.S.C. § 1395x(h) (1976).

tients. Therefore, Diplomat qualifies as a "provider of services" under the statute for the services rendered in its skilled nursing facility. *Id.* § 1395x(u). Diplomat also provides "intermediate" and "custodial" types of care which are less intensive than skilled nursing care and for which Diplomat does not receive Medicare reimbursement.

The relevant statute requires that providers be reimbursed for the services they furnish Medicare patients on the basis of their customary charge for, or the "reasonable cost" of, those services, whichever is less. *Id.* § 1395f(b). Reasonable costs must be determined pursuant to methods set forth by regulation. *Id.* § 1395x(v)(1)(A). Those computation methods must be fashioned to insure that Medicare costs are not borne by non-Medicare patients. *Id.*

Reimbursement to providers for services rendered to Medicare beneficiaries is made either by the Secretary or, more commonly, by private insurance companies which serve as fiscal intermediaries pursuant to contracts with the Secretary. *Id.* § 1395h.[3] The intermediaries make interim estimated payments to providers. *Id.* § 1395g; 42 C.F.R. § 405.454 (1978). At the close of the providers' fiscal year, the intermediaries make final determinations regarding properly reimbursable costs based upon "cost reports" which the providers are required to file. *Id.* § 405.406(b).

Providers must distinguish between "routine" and "ancillary" services in their accounting. "Routine" services include bed, board, nursing care, minor medical and surgical supplies, and the use of equipment for which a separate charge is not made. *Id.* § 405.452(d)(2). All other services—*i. e.*, those "for which charges are customarily

made in addition to routine charges"—are "ancillary" services. *Id.* § 405.452(d)(3).

A skilled nursing facility administers the next most intensive level of care below a hospital. Medicare beneficiaries in skilled nursing homes must be certified by a physician as requiring daily supervised professional health care. *Id.* § 405.1632. Approximately one-fourth of Diplomat's patients require this high degree of care and otherwise qualify for Medicare benefits. It is acknowledged generally that patients in skilled nursing facilities require more of some routine services—*e. g.*, more nursing care, more minor medical and surgical supplies and greater use of equipment—than patients receiving lower levels of care.

## A. The 1966 Regulations

In 1966 the Secretary promulgated regulations giving all skilled nursing homes two options in computing their costs: the Departmental Method or the Combination Method. 20 C.F.R. § 405.452(a); 31 *Fed. Reg.* 14808, 14817 (1966). For Diplomat, the computation of reimbursable costs for ancillary services is essentially the same under either method. The two methods differed, however, in how reimbursable costs for routine services were to be computed.

Under the Departmental Method, providers computed "[t]he ratio of [Medicare] beneficiary charges to total patient charges for the services of each *department* [as] . . . applied to the cost of the department." *Id.* 405.452(a)(1) (emphasis supplied).[4] The figure resulting from that process included the providers' reimbursable Medicare costs for both routine and ancillary services.

The Combination Method provided that:

> the ratio of inpatient charges to beneficiaries of the health insurance program for services of a revenue-producing department or center to the inpatient charges to all patients for that center during an accounting period. After each revenue-producing center's ratio is determined, the cost of services rendered to beneficiaries of the health insurance program is computed by applying the individual ratio for the center to the cost of the related center for the period.
>
> 20 C.F.R. § 405.452(b)(6), 31 *Fed.Reg.* at 14817.

---

**3.** The use of fiscal intermediaries permits the handling of billing by organizations skilled in such matters and relieves the Secretary of that administrative responsibility. Providers who do not wish to deal with private intermediaries, however, may seek reimbursement directly from the Secretary. 42 C.F.R. §§ 405.651(a) & 405.654 (1978).

**4.** In more detail, the Departmental Method of cost accounting was based on

The cost of "routine services" for program beneficiaries is determined on the basis of *average* cost per diem of these services . . . [plus] the cost of ancillary services used by beneficiaries, determined by apportioning the total cost of ancillary services on the ratio of beneficiary charges for ancillary services to total patient charges for such services.

*Id.* § 405.452(a)(2) (emphasis supplied).[5]

In simplified terms, therefore, the Combination Method requires providers operating nursing homes to average the costs of their routine services for all patients, regardless of the level of care—*i. e.,* skilled, intermediate or custodial. In contrast, under the Departmental Method a nursing home provider is paid on the basis of the costs attributable to the routine services its Medicare patients receive at the skilled nursing level of care. As explained below, that distinction becomes crucial in determining whether the Secretary abused his[6] discretion in 1972 by requiring that large independent nursing homes use the Combination Method, because that method of cost computation has no adequate mechanism for reflecting the fact that patients in skilled nursing facilities generally require and receive more routine services than patients receiving lower levels of care,[7] and it therefore is less accurate than the Departmental Method.

Until 1972 Diplomat utilized the Departmental Method in order to reflect the fact that all of its Medicare patients received the more intensive routine services provided in its skilled nursing unit.

## B. The 1972 Regulations

In December 1970 the Committee on Finance of the United States (Senate Finance Committee) reported on several amendments to the Medicare reimbursement standards not relevant here. In its report, however, the Senate Finance Committee described two "additional matters of concern," one of which involved the option in the 1966 regulations for Medicare providers allowing them to use either the Departmental or Combination Method. S.Rep.No. 1431, 91st Cong., 2d Sess. 178–80 (1970) [hereinafter *1970 Senate Report*].

---

**5.** Those two components of the Combination Method—*i. e.,* the average cost per diem for routine services and the ratio of beneficiary charges for ancillary services—were further described in 1966:

Average cost per diem for routine services means the amount computed by dividing the total allowable inpatient cost for routine services by the total number of inpatient days of care (excluding newborn days where nursery costs are excluded from routine service costs) rendered by the provider in the accounting period.

\* \* \* \* \* \*

Ratio of beneficiary charges for ancillary services to total charges for ancillary services, as applied to inpatients, means the ratio of the total inpatient charges for covered ancillary services rendered to beneficiaries of the health insurance program to the total inpatient charges for ancillary services to all patients during an accounting period. This ratio is applied to the allowable inpatient ancillary costs for the period to determine the amount of reimbursement to a provider for the covered ancillary services rendered to beneficiaries.

20 C.F.R. § 405.452(b)(7) & (8), 31 *Fed.Reg.* at 14817. In 1972, those descriptions were expanded to exclude (for cost reporting periods beginning after December 31, 1971): (1) "services provided in intensive care units, coronary care units, and other special care inpatient hospital units as well as nursery costs," from the determination of average cost per diem, and (2) delivery room costs, in computing the ratio of beneficiary charges for ancillary services. 37 *Fed.Reg.* 10353, 10355 (1972). Other changes to the descriptions of the Departmental and Combination Methods have been made since 1966, but none of them is relevant for our purposes.

**6.** The Secretary of HEW in 1972 was Elliot L. Richardson. The present occupant of that office is Patricia Roberts Harris, as the caption of this case reflects.

**7.** The 1966 regulations pointed out that

title XVIII beneficiaries are not a cross section of the total population . . . . Available evidence shows that the use of services by persons age 65 and over differs significantly from other groups. Consequently, the objective sought in the determination of the title XVIII share of a provider's total costs means that the methods used for apportionment must take into account the differences in the amount of services received by patients who are beneficiaries and other patients served by the provider.

20 C.F.R. § 405.403(c), 31 *Fed.Reg.* at 14809.

According to the 1970 Senate Report, both the Comptroller General and HEW's Audit Agency had recommended a total scrapping of the less accurate Combination Method because it resulted in the inclusion of some nonreimbursable ancillary costs (e. g., for pediatric and obstetrical care) under the Medicare statute. The Committee was concerned, however, about imposing the more precise but admittedly more burdensome Departmental Method on smaller institutions. A compromise was struck. The Committee and the Secretary "concur[red]" that facilities with fewer than 100 beds should be required to use the Combination Method; "larger institutions (e. g., those with 100 beds or more) should be required to carry out cost finding under more sophisticated methods and to apportion costs under the more accurate Departmental Method." Id. at 179.

On November 17, 1971, the Secretary proposed several changes in the Medicare regulations, one of which was to eliminate the option between the Departmental and Combination Method for all providers. Despite the Senate Finance Committee's 1970 Report, however, emphasizing facility size as the distinguishing factor between nursing homes for accounting purposes, all independent nursing homes of whatever size were required to use the less accurate Combination Method for cost reporting periods beginning after December 31, 1971. 36 Fed. Reg. 22987, 22989 (1971). On the other hand, large (over-100-bed) hospitals or hospital-nursing home complexes had to use the Departmental Method. In spite of the drastic effect of that proposal on large independent nursing homes, the preamble to the proposed regulations gave no explanation for the differentiation.

On April 21, 1972, the Secretary adopted the November 1971 proposed regulations with no change. 37 Fed.Reg. 10353, 10355 (1972). Again no justification was offered for the requirement that large independent nursing homes use the Combination Method. The Secretary said only:

Many of the correspondents opposed elimination of the option, heretofore permitted under regulations, allowing hospitals to use either the Combination Method or Departmental Method of apportionment. Elimination of the option has been retained. The option was originally granted to accommodate institutions that found the more sophisticated Departmental Method difficult to employ. In practice, however, this provider option gives each provider the opportunity to select the method that will result in greatest reimbursement from the program.

Id. at 10353. Thus, the single factor mentioned to justify continued use of the Combination Method was lack of accounting sophistication.

Following adoption of the 1972 Regulations and in response to protests from the American Hospital Association and other provider representatives, the Secretary in August and September 1972 conducted a random survey of 20 out of the approximately 4,000 independent nursing homes in the Medicare Program to determine the impact on them of the Combination Method. Because of the small number of independent nursing homes surveyed, the results were inclusive.

C. *The 1979 Regulations*

Nearly three years later, in December 1974, the Secretary ordered another survey to determine whether skilled nursing facilities regardless of size or hospital affiliation then required to use the Combination Method were, in fact, sufficiently skilled in their accounting practices to utilize the more accurate Departmental Method. This time 842 providers were questioned. The survey, completed in July 1975, established that the "vast majority" of such facilities (i. e., 95 to 98 percent) had the requisite accounting capability to use the Departmental Method. Joint Appendix (J.A.) 62. Acting upon those results, the Secretary signified he would consider a further amendment of the regulations to completely eliminate the Combination Method as to all providers.[8]

---

8. Mr. Thomas Tierney, the Director of HEW's Bureau of Health Insurance, brought HEW's proposal to eliminate the Combination Method to the attention of the American Health Care

HEW officials also contacted the Dallas regional Medicare director on November 11, 1976, and directed the Dallas office to advise two of its fiscal intermediaries to begin accepting current and resubmitted cost reports from small hospitals and independent nursing homes [9] which followed "discrete costing" principles "in general agreement with" the Departmental Method, as long as those facilities maintained "auditable records" reflecting specific cost allocations. J.A. 103 & 105.[10] The effect of the letter (which was not, apparently, ever incorporated in any formal announcement to provid-

ers) was to establish an exception procedure allowing the fortunate providers who knew of its existence to avoid the inequities of the 1972 regulations if the required cost-allocation showing was made.

Diplomat obtained a copy of the letter in the fall of 1977, pursuant to a Freedom of Information Act request a year after this lawsuit was begun. Shortly thereafter, Diplomat requested and obtained from the Secretary a tentative agreement that Diplomat might avail itself of the exception process as well. *Id.* at 99–103. Accordingly,

---

Association (AHCA) in July 1975. "Because of the importance of this proposal," Mr. Tierney solicited the AHCA's immediate response. J.A. 63.

9. Since 1974 the Medicare regulations have provided a mechanism for reopening and revising cost reimbursement decisions "inconsistent with the applicable law, regulations or general instructions issued by [HEW]." 20 C.F.R. § 405.1885(b), 39 *Fed.Reg.* 34514, 34519 (1974); 42 C.F.R. § 405.1885(b) (1978).

10. That letter stated in pertinent part: ·
In preparing their costs reports, some providers have followed the specific allocation bases specified on the SSA–2570 form. Other providers have allocated costs on their books prior to allocating costs on the SSA–2570, or have assigned costs directly to cost centers within the provider or to the organizational or functional components of the health care complex generating those costs in lieu of allocating such costs through the use of estimates or statistical bases. The allocation bases shown on the face of the SSA–2570 produce an equitable result for small hospitals where no nonallowable cost centers are involved (nursing homes, clinics, etc.). However, it has been found that small hospitals with nonallowable cost centers may sometimes produce a more accurate allocation of costs between the hospital and the nonallowable cost center(s) through other than a strict application of the prescribed bases. Simply stated, the hospital may have auditable records (e. g., billings based on utility meter readings, time records, etc.) that more specifically reflect where the costs were incurred than would result through a rigid adherence to the allocation bases specified on the SSA–2570 form itself.
The real objective is to ensure that the program pays for the reasonable cost of services given to its beneficiaries. *Consequently, where the provider maintains cost data in a manner which accurately segregates provider costs from the nonprovider costs, such data*

*may be used for determining program reimbursement.* To be acceptable, however, there must be demonstrable evidence that the provider was using this accounting methodology consistently on its books.
Taking into consideration the above requirements, you are authorized to settle all cost reports where the provider has used cost allocations prior to allocating costs on the SSA–2570 forms where bases for such allocations result in more equitable reimbursement. *Such bases should be in general agreement with the bases found acceptable in settling cost reports for facilities of 100 beds or more.*

\* \* \* \* \* \*

Although we have emphasized that auditable reliable data must be used to support allocations in all instances, some judgment should be used when determining whether a settled cost report (Notice of Program Reimbursement has been sent) should be reopened. If the vast majority of the allocations used are supportable even though some estimates have been made, the cost report should not be reopened as long as the estimates did not have a material effect on the final outcome. Also, it is not expected that you search your files for providers who reported and allocated all costs in strict accordance with the allocation bases specified on the SSA–2570 itself but could possibly support additional reimbursement by using direct charging of costs. *If, however, a provider comes forward and can furnish reliable data justifying additional reimbursement through allocation or direct assignment of costs, you should reexamine the costs report if the time limit for reopening has not expired.* The above approach is consistent with the instructions implementing the SSA–2570 form and should enable you to settle cost reports where you have encountered the cost finding issue discussed above.
J.A. 104–06 (emphasis supplied).

Diplomat submitted a "discrete costing" proposal to its fiscal intermediary in 1977. At the time of oral argument, that proposal apparently had not been finally accepted or denied.[11] In 1976, the Secretary finally proposed new regulations requiring the use of the Departmental Method for all Medicare providers. 41 *Fed.Reg.* 52067 (1976).

The preamble to the proposal stated that the 1970 Senate Finance Committee report had been the cause for his prior action in 1972 requiring the Combination Method for smaller nursing homes and independent nursing homes. *Id.* at 52068. In support of the new proposal to do away with the Combination Method altogether, the justifications given were: (1) the 1975 survey showed that virtually all providers had the accounting capability to use the Departmental Method, (2) the Departmental Method would not unduly burden small providers, because statutory changes in 1972 already required more precise accounting in other contexts, and (3) the Departmental Method is a more precise method of computing Medicare-related patient costs. *Id.*[12] It was not, however, until over two years later, in January 1979, that the Secretary finally adopted the new regulations requiring the Departmental Method for all providers for reporting periods beginning on or after July 1, 1979. 44 *Fed.Reg.* 3984 (1979).

Despite the long delay between the proposal in 1976 and the final issuance of the new regulations in 1979, the Secretary refused to apply them retroactively because the benefits "would [not] be sufficient to justify the administrative effort." *Id.* at

3985. Furthermore, the Secretary concluded that the procedures allowing for an exception "provide some degree of the flexibility sought by . . . providers [seeking retroactive application of the 1979 change]." *Id.*

**D. The Proceedings Below**

Pursuant to the 1972 regulations, Diplomat and other large nursing homes filed cost reports with their fiscal intermediaries using the Combination Method for accounting periods starting after December 31, 1971. The providers' fiscal intermediaries computed their Medicare reimbursements for those periods on that basis. The first reporting period to which Diplomat applied the Combination Method was fiscal year August 1, 1971 to July 31, 1972.

On April 2, 1975 (before the HEW exception letter was written) those providers began a declaratory judgment action in the district court challenging the 1972 regulations. That court dismissed the complaint, on the ground that the providers had failed to exhaust their administrative remedies under 42 U.S.C. § 1395*oo*. *Aristocrat South, Inc. v. Mathews*, 420 F.Supp. 23 (D.D.C.1976).

Section 1395*oo* allows any provider dissatisfied with a decision of its fiscal intermediary to obtain a hearing before HEW's Provider Reimbursement Review Board (PRRB). The PRRB may affirm, modify or reverse the determinations of a fiscal intermediary and make "any other modifications" on matters covered by the provider's cost reports. 42 C.F.R. § 405.1869 (1978).[13]

---

**11.** Diplomat's fiscal intermediary transmitted Diplomat's exception request to HEW's Chicago regional office for approval of the accounting methods Diplomat used. *Id.* at 109–11. The regional office rejected most of the discrete costing principles Diplomat proposed to use, however, in May of 1978, on the ground that Diplomat's proposal was principally based on estimated costs rather than auditable records. *Id.* at 112–13. But the regional office concluded that it is "the intermediary's primary responsibility to determine if the proposed methodology does in fact produce a more accurate allocation of cost." *Id.* at 113. Diplomat responded with a letter to its fiscal intermediary asserting that its discrete costing proposal was

in fact based on "auditable records." *Id.* at 117–21. That, so far as we can tell, is whether the matter stands, based on the record before us.

**12.** The Secretary inexplicably characterized his proposal as one "not hav[ing] major program significance." 41 *Fed.Reg.* at 52067.

**13.** The background and formation of the PRRB have been discussed by this court previously in *Humana of South Carolina, Inc. v. Califano*, 191 U.S.App.D.C. 368, 374–383, 590 F.2d 1070, 1076–85 (1978), and in *Association of American Medical Colleges v. Califano*, 186 U.S.App.D.C. 270, 274–76, 569 F.2d 101, 105–07 (1977).

Diplomat then took its case to the PRRB, where it was decided on a stipulated record. The stipulation concluded that Diplomat suffered a loss of $56,302 in reimbursements for the fiscal years 1973 and 1974 due to the enforced use of the Combination Method rather than the Departmental Method.[14] It was also stipulated, however, that Diplomat had no choice in those years but to use the Combination Method even though the Departmental Method was the more accurate one. Thus, the PRRB ruled that it was "bound" by the 1972 regulations and could not assist Diplomat in any way:

> Although the Board is sympathetic with the Provider's position, it must find for the Intermediary as the Board is bound by the Regulations promulgated by the Secretary of Health, Education, and Welfare.
>
> However, the Board believes it appropriate to state that the method of apportionment which the Provider is forced to employ may only be appropriate for certain unsophisticated providers. The Provider has demonstrated that it has the capability to use the more sophisticated Departmental Method of apportionment and the Board believes that this latter method is substantially more accurate in most situations. Further, the Board believes that the instant situation is an appropriate example of this. The Board further notes that evidence was presented indicating that even the Bureau of Health Insurance does not dispute the fact [that] . . . the Departmental Method is a more accurate method for cost apportionment assuming the providers have the accounting capabilities to employ same.
>
> \* \* \* \* \* \*

The Provider must use the Combination Method of cost apportionment with simplified cost finding for the cost reporting periods ended July 31, 1973 and 1974.

J.A. 9–10. Diplomat then returned to the district court for judicial review under 42 U.S.C. § 1395oo (f)(1) (1976).

On cross-motions for summary judgment, the district court found the 1972 regulations valid. The Secretary admitted (J.A. 71) and the district court recognized (453 F.Supp. at 444) that the Departmental Method is a more accurate indicator of Medicare patient-related costs, although it requires greater accounting sophistication on the part of the provider than the Combination Method. But the court thought that the criticism in the 1970 Senate Report of the excessive costs to the Medicare program which resulted from allowing providers to choose between the Combination and Departmental Methods was an adequate justification for the 1972 regulations taking away that option and requiring specific cost computation methods for various categories of providers.

This was so even though the court recognized that the 1970 Senate Report focused on facility size and accounting sophistication rather than hospital affiliation in differentiating between facilities for which the Combination Method was appropriate and those for which the Departmental Method should be required. It concluded that deference must be paid to the Secretary's distinction in the 1972 regulations between large independent nursing homes and large hospital-affiliated nursing homes on the ground that large hospitals and affiliated nursing homes are "most likely" to have sophisticated accounting abilities; the group required to use the Combination Method on the other hand included providers "tending" to have less accounting sophistication. *Id.* at 446. The court further found that a regulatory scheme need not be equitable in every case to be reasonable.[15]

14. Since the statute vested the PRRB with review authority only over "accounting periods ending on or after June 30, 1973," Pub.L. 92–603, Title II, § 243(a), 86 Stat. 1422 (1972), only Diplomat's fiscal years 1973 and 1974 could be put at issue. The statutory time for filing with the PRRB expired for the other parties in the original 1975 suit before the district court's dismissal on exhaustion. Applt. Br. 3.

15. The court mentioned, in a footnote, Diplomat's pending exception request, apparently as evidence that a mechanism exists for fine-tuning the system. 453 F.Supp. at 446 n.15. The court also held that the Secretary's justification

## II. THE LEGALITY OF THE 1972 REGULATIONS

We can find no rational basis in the record nor in any justification proffered by the Secretary for the distinction drawn in the 1972 regulations (for purposes of cost computation methodology) between large independent nursing homes on one hand, and large hospitals or hospital-nursing home complexes on the other. Therefore, we are compelled to reverse the decision of the district court upholding the validity of the regulations as they applied to Diplomat. We remand the case to the district court to enter summary judgment on behalf of Diplomat as to the invalidity of the 1972 regulations as applied to it and to grant further relief consistent with this opinion.

### A. The Standard of Review

 The burden of showing that the distinction in permissible accounting methods of which it complains in the 1972 regulations was "arbitrary, capricious, [or] an abuse of discretion" [16] lay, of course, with Diplomat.[17] We would be obliged to affirm the decision below if we could find a rational basis in the record for the Secretary's action.[18] We must "uphold a decision of

less than ideal clarity if the agency's path may reasonably be discerned." [19]

 But as the Supreme Court held in *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943), the Secretary's action cannot be upheld "merely because findings might have been made and considerations disclosed which would justify [the 1972 regulations] . . . ." The Secretary must give "clear indication that [he] . . . has exercised the discretion with which Congress has empowered [him] . . . ." *Id.* at 94–95, 63 S.Ct. at 462, quoting *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). In short, we must be satisfied that the distinction in the 1972 accounting regulations between large independent nursing homes and large hospitals or hospital-extended care facilities "was based on a consideration of the relevant factors" and that there has not been "a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). *See Home Box Office, Inc. v. FCC*, 185 U.S.App.D.C. 142, 167–169, 567 F.2d 9, 34–36, cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *Nat'l Ass'n of Food Chains, Inc. v. ICC*, 175 U.S.App.D.C. 346, 356,

for the 1972 change, *i. e.*, to eliminate excessive ancillary cost reimbursements due to the previous optional use of the Combination or Departmental Method, in the preamble accompanying its final promulgation was a sufficient statement of basis and purpose under § 4 of the Administrative Procedure Act (APA), 5 U.S.C. § 553.

16. 5 U.S.C. § 706(2)(A) (1976); 42 U.S.C. § 1395oo(f) (1976). *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The test is not whether there is substantial evidence to support the PRRB's decision. See 5 U.S.C. § 706(2)(E). There is no dispute that Diplomat possessed the accounting sophistication the Departmental Method requires. The only issue before us is the substantive validity of the 1972 regulations the PRRB felt bound to apply.

17. *American Nursing Home Ass'n v. CLC*, 497 F.2d 909, 914 (Em.App.1974); *New York Foreign Frgt. F. & B. Ass'n v. FMC*, 337 F.2d 289, 295 (2d Cir. 1964), cert. denied, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965).

18. *FCC v. Nat'l Citizens Comm. for Broadcasting*, 436 U.S. 775, 803, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); *Bowman Trans., Inc. v. Arkansas-Best Freight S., Inc.*, 419 U.S. 281, 284, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Certified Color Mfgrs. Ass'n v. Mathews*, 177 U.S.App.D.C. 137, 145–47, 543 F.2d 284, 292–94 (1976); *American Paper Institute v. Train*, 177 U.S. App.D.C. 181, 191, 543 F.2d 328, 338, cert. dismissed, 429 U.S. 967, 97 S.Ct. 398, 50 L.Ed.2d 335 (1976); *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 405–409, 541 F.2d 1, 33–37 (en banc), cert. denied sub nom. E. I. duPont de Nemours & Co. v. EPA, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

19. *Bowman Trans., Inc. v. Arkansas-Best Freight S., Inc.*, supra n.18, 419 U.S. at 286, 95 S.Ct. at 442, citing *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945).

535 F.2d 1308, 1318 (1976).[20] Our "sole concern" in the *Food Chains* case, as it is here, was whether the agency gave "reasoned consideration to the problem and . . . presented a rational basis for its decision." 175 U.S.App.D.C. at 354, 535 F.2d at 1316.

## B. *Legal Analysis*

We begin our analysis with a reference to the applicable statutory guidelines pursuant to which the Secretary acted in promulgating the regulations in question. The Secretary is obligated to pay providers for the "reasonable cost" of care provided to Medicare patients. The statute provided in 1972:

> The reasonable cost of any services shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services . . . . In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. . . .
> Such regulations *shall* (A) *take into account both direct and indirect costs of providers of services in order that, under the methods of determining costs, the costs with respect to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs,* and (B) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.[21]

When he first proposed the controversial 1972 regulations, the Secretary made no explanation at all of why the more accurate Departmental Method option was being taken away from large independent providers who had heretofore used it efficiently. In fact, the 1972 proposed regulations stated that their "objective" was, in accordance with the statutory mandate, to accord providers the "reasonable costs" attributable to Medicare patients:

> The law provides that the costs with respect to individuals covered by the health insurance program will not be borne by individuals not so covered, and conversely

**20.** *Accord, Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 335, 486 F.2d 375, 402 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *Greater Boston Tele. Corp. v. FCC,* 143 U.S.App.D.C. 383, 391–94, 444 F.2d 841, 850–53 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). The *Food Chains* case presented a situation not unlike this one. After an extensive investigation of several motor common carriers, the Interstate Commerce Commission (ICC) initially concluded that the carriers had not established the necessity for tariff changes that would place the duty of loading and unloading freight upon shippers; it found that the carriers' duty to perform loading services shall be decided on a case-by-case basis. It subsequently reversed that holding on the basis of the same record and found that no carrier had a duty to load or unload cargo. 175 U.S.App.D.C. at 351, 535 F.2d at 1313. The only basis cited for its changed decision was a separate ICC proceeding in which no opposition was raised to the petition of three carriers to eliminate the loading services. This court rejected the ICC's inference drawn from the separate proceeding that shippers in general did not need loading services from carriers. We could not find any support for such a conclusion in the record and hence remanded the case. *Id.* at 356, 535 F.2d at 1318.

**21.** Pub.L. 89–97, § 102(a), 79 Stat. 322–23 (1965); 42 U.S.C. § 1395x(v)(1) (1972) (emphasis supplied). In 1972, after the regulations challenged here were promulgated, the statute was amended to provide that the "reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services . . . ." Pub.L. 92–603, § 223(a), 86 Stat. 1393 (1972).

that costs with respect to individuals who are not under the program will not be borne by the program.

Proposed 20 C.F.R. §§ 405, 452(e); 36 *Fed. Reg.* at 22990. And although the proposed regulation prescribed the type of accounting method nursing homes could use after January 1, 1972, it allowed the use of either method for periods up to that time, provided that the objective of "whatever method of apportionment is used will be to approximate as closely as practicable the *actual* cost of services rendered." *Id.* (emphasis supplied). The proposal emphasized that:

> The two methods of apportionment available for use in determining the cost of services rendered to beneficiaries of the program have as their goal the allocation of the total allowable costs between the beneficiaries and other patients in as *equitable* a manner as possible. Under these methods, if it is found that beneficiaries receive more than the average amount of services, the providers would receive reimbursement greater than average cost for all patients. Conversely, if the beneficiaries receive less than the average amount of services, the providers would be reimbursed accordingly for the services rendered.

*Id.* (emphasis supplied).

It is clear, then, from these excerpts that the articulated objective of the 1972 regulations—like the 1966 regulations (*see* 31 *Fed. Reg.* at 14817)—was to provide reimbursement on the basis of the most reasonable approximation practicable to the actual costs of providers in servicing Medicare patients.

The record does reflect that one of the practicalities with which the Secretary had to cope, however, was the uneven "cost finding" capabilities among providers, a factor he noted in proposing both the 1966 and 1972 regulations.[22] Indeed, we would

have no problem at all in upholding these regulations if he had gone ahead and drawn a distinction between different kinds of providers on the basis of their actual accounting sophistication, or even provided some basis in the record for broad groupings incorporating such a distinction. The Secretary did do this to some degree in applying the Combination Method to small providers and the Departmental Method to large ones. Unfortunately, however, he did not cite any evidence in the agency record or even in the agency's experience that would warrant drawing such a distinction between large hospital-affiliated nursing homes and large independent nursing homes.

It is noteworthy that even now the Secretary makes no such claim. He admitted in this case that the 1972 regulations were "not based upon any study that included a review of the impact of the 'Combination Method' of cost apportionment on 'extended care facilities' previously using the 'Departmental Method' of cost apportionment, [or] . . . the accounting capability of such 'extended care facilities' to use the 'Departmental Method' of cost apportionment." J.A. 76. Nor did he conduct any "survey of the use by 'extended care facilities' of the more sophisticated 'Departmental Method' of cost apportionment." *Id.* In fact, his original proposal, as stated in the 1970 Senate Report, had been to do away altogether with the Combination Method.

Although the 1972 regulations in proposed or final form made no reference to the 1970 Senate Report, the Secretary argued before the district court that the changes were motivated by it. He also made that statement in the preambles to the proposed and final amendments in 1976 and 1979. 41 *Fed.Reg.* at 52068; 44 *Fed. Reg.* at 3985. Thus, it behooves us to take a careful look at the Report.

---

22. The proposed 1972 regulations noted that:

It is recognized that prior to the effective date of the health insurance program many hospitals and other providers did not employ methods for ascertaining the cost of the services they produce, either by departmental or other groupings of services. To avoid an undue burden on providers and to allow am-

ple time for all providers to adopt the cost-finding methods needed for the apportionment methods under the program, a temporary method has been authorized at the option of the provider for accounting periods before January 1, 1968 ( . . . . 36 *Fed.Reg.* at 22988. *See also* 31 *Fed.Reg.* at 7866.

The 1970 Senate Report criticized the excessive Medicare costs attributable to the inclusion of certain pediatric and obstetrical services—i. e., ancillary services—in reimbursable costs under the Combination Method. *1970 Senate Report* at 179. The Report also recognized that the Combination Method had been allowed as an option for both large and small "institutions" in the past because "even some relatively large hospitals would have difficulty completing the required cost finding and would also be unable to apportion costs under the Departmental Method because of poor recordkeeping practices, and this initial [1966] provision for simplifying reimbursement even for the largest institutions seems reasonable *for the past.*" *Id.* (emphasis supplied).

But a close reading of the Report leaves us with no doubt that the Senate Finance Committee clearly envisioned a new system for the future that would not allow, let alone mandate, the Combination Method for large institutions.

It is recognized that medicare cost finding and cost reporting requirements have contributed to an upgrading in recordkeeping and accounting systems and it does not seem unreasonable now to expect *all larger institutions* which generally receive larger medicare payments *to*

use *the more accurate Departmental Method* of apportionment of costs between medicare and other payers. On the other hand, the committee is concerned that for smaller providers program cost finding requirements should be simplified wherever possible and wherever equitable.

Therefore, the committee and the Department concur that the Department should simplify its cost finding and cost reporting requirements for smaller institutions (e. g. those having less than 100 beds) and require the use of the Combination Method by those institutions without an option to use the Departmental Method. At the same time *larger institutions (e. g. those with 100 beds or more) should be required to carry out cost finding under more sophisticated methods and to apportion costs under the more accurate Departmental Method.*

*1970 Senate Report* at 179–80 (emphasis supplied).[23] It is impossible to find in the Report any license to impose the disfavored Combination Method upon large independent institutions.[24] The Report stressed that there was a correlation between cost finding sophistication and size; it nowhere mentioned any such correlation with hospital affiliation.

The Department has stated that it will move ahead as expeditiously as possible, after appropriate consultation, to develop and implement through regulations, forms, and instructions the new cost finding and cost reporting requirements to be applied after due notice. Such requirements are expected to apply to institutional fiscal years beginning on or after July 1, 1971. It is reasonable to continue to explore possible revisions in cost finding and cost apportionment to always seek the best balance of accuracy and equity.

*1970 Senate Report* at 180 (emphasis supplied).

**23.** The Report continued:

By requiring simplified cost finding and the Combination Method for smaller institutions and the Departmental Method for larger institutions the program would: eliminate the provider option which gives a provider an advantage in reimbursement based on informed selection of method (not necessarily on any justifiable merit); eliminate the need for providers to try out more than one method to see which is more favorable; relate the degree of cost finding and cost determinations to the relative administrative expertise of providers (*there is a correlation between accounting systems and expertise and institution size*); result in better cost reimbursement determinations for the larger institutions which receive the greater part of Medicare payments; and permit better cost analyses for making program payment determinations because *all providers of a given size would use the same method of cost finding and be reimbursed under the same method of apportionment.* Moreover, it is expected that implementing these requirements would reduce the recordkeeping and auditing costs of both the institutions and the program.

**24.** Of course, the Report does support that portion of the 1972 regulations which mandates the Combination Method for all nursing homes below 100 bed size and that portion which requires the Departmental Method for hospital-extended care facilities having over 100 beds. It might also have been justifiable to have thrown large independent facilities in the below-100-bed size grouping, if there were so few of them as to make it administratively inefficient to consider them separately. The record

The final regulations promulgated in April 1972 again failed to discuss any justification for the distinction in question. The Secretary did allude generally to objections he had received during the comment period on the elimination of the option, but he did not touch on the distinction among larger institutions at issue here. 37 *Fed.Reg.* at 10353. We are forced to conclude that he either was not aware of the problem at all[25] or he chose to ignore it. In either event, he has provided us with no findings or evidence in the record to support the distinction.[26]

In contrast, when the Secretary proposed a radical turnabout in 1976 to eliminate the Combination Method altogether, he cited as his basis: 1) two interim studies, one of which involved 842 nursing homes then us-

ing the Combination Method, 2) extensive provider and Congressional correspondence, and 3) General Accounting Office data and "results of our own reviews." 41 *Fed.Reg.* at 52068.[27] The Secretary in this same preamble explained the 1972 regulations only as having been "established in accordance with the report of the Senate Finance Committee," and their "objective" as "to eliminate the choice of reimbursement methods" in order to "relieve the smaller and less complex providers of the necessity for developing the more sophisticated accounting procedures as now required by step-down cost finding and the Departmental Method of apportionment." *Id.*

■ The motivation for the 1972 distinction between large independent nursing homes and large hospitals or hospital-nurs-

---

shows, however, that in 1972 there were more than 4,000 independent facilities participating in the Medicare program. J.A. 77. And at least as late as 1974 when there remained more than 3,300 independent nursing homes in the program, more than 800 of them had over 100 beds. *Id.* at 86.

**25.** See, however, the Secretary's statement in the preamble:

Some parties expressed the view that the proposed regulations were developed and published without consultation with the health care field. Actually prior to drafting the proposed changes as a notice of proposed rule making, the Social Security Administration consulted with the major provider organizations and other persons knowledgeable in the health care field and solicited their views and recommendations.

37 *Fed.Reg.* at 10353.

**26.** One additional point deserves attention. The 1970 Senate Report notes that the Comptroller General and the HEW Audit Agency recommended the elimination of the Combination Method in 1970 because it allowed certain pediatric and obstetrical costs to be included in providers' total ancillary costs, a criticism which was apparently directed at hospitals rather than nursing homes. *1970 Senate Report* at 179; *see Administration of Federal Health Benefit Programs (Part 1—Medicare Program): Hearings Before a Subcommittee of the House Committee on Government Operations,* 91st Cong., 2d Sess. 30–54 (1970) (questioning of Thomas M. Tierney, Director, Social Security Administration, Bureau of Health Insurance). The Secretary asserts that nursing homes provide fewer ancillary services than hospitals, argues that they therefore had less of

an opportunity than hospitals to abuse the Combination Method, and concludes that this lack of opportunity for abuse justifies his application of that method to large as well as small independent nursing homes. On consideration, however, this argument does not hold up. Although it might be an additional reason for not requiring the Departmental Method where other reasons such as lack of accounting sophistication militate against such a requirement, as in the case of small facilities, it makes no sense as a *primary* reason for not allowing a large facility with sophisticated accounting capability to use the more accurate method.

**27.** Regarding the survey, the Secretary stated:

. . . The questions asked in the survey were formulated to determine whether (1) total costs and charges and health insurance program charges could be accumulated for each ancillary department; (2) total costs and inpatient days and health insurance inpatient days could be accumulated for each special care inpatient hospital unit; and (3) providers were willing to convert to the Departmental Method of apportionment and step-down or a more sophisticated method of cost finding. This survey revealed that all but a few of the providers surveyed are able to develop the necessary statistics which would enable them to use the Departmental Method of apportionment and step-down or a more sophisticated method of cost finding. Moreover, a majority of the providers surveyed stated their preference to use the Departmental Method of apportionment and step-down or a more sophisticated method of cost finding.

41 *Fed.Reg.* at 52068.

ing home complexes remains unfathomable. We must therefore disagree with the lynchpin of the district court's opinion that "this categorization was sound and reasonable, demonstrating the Secretary's 'consideration of relevant factors': bed size, accounting sophistication, and excessive reimbursement problems . . . ." 453 F.Supp. at 446 (citations omitted). Similarly, we cannot agree with the district court's conclusion that:

. . . The Departmental Method group includes those large providers most likely to have sophisticated accounting ability, namely hospitals and nursing homes affiliated with hospitals. The Combination Method group encompasses the providers tending to have less accounting prowess and least likely to

abuse the ancillary cost aggregation procedures of the Combination Method. The Secretary chose this breakdown of facilities in order to improve Medicare reimbursement procedures for the majority of providers and thereby benefit Medicare recipients.

*Id.*[28] Our independent review of the Secretary's single justification, the 1970 Senate Report, as well as his admission that no other investigation was made of independent nursing home accounting capabilities prior to the 1972 changes convinces us differently: there is no rational basis for the distinction.[29]

■ Thus, although, as the district court cautioned, due deference should be paid an agency's determination of how best to

---

28. The district court also opined that "[i]f Diplomat Lakewood could provide HEW with acceptable figures for actual costs . . . HEW would reimburse it at that level, pursuant to an exception to the regulations. Diplomat Lakewood has not been able to produce such exact figures for HEW." 453 F.Supp. at 446 n.15. The Secretary also cited existing procedures for reopening cases in his refusal to make the 1979 elimination of the Combination Method retroactive. 44 Fed.Reg. at 3985. Furthermore, the Secretary presses (although weakly) the possibility of that alternative remedy as a ground for concluding that Diplomat still has not fully exhausted its administrative remedies. Gov't Br. 12–13 n.8 & 16–17 n.10. From the record it appears to us that: (1) Diplomat has been trying for some time to find out from its fiscal intermediary (to whom it must submit cost reports) what it needs to do to qualify for an exception; the intermediary and the Secretary have been sparring over whose responsibility such instructions are, with the controversy still unresolved (J.A. 99–102); (2) Diplomat has already submitted its case to the PRRB, pursuant to the district court's earlier instructions (420 F.Supp. at 27) and over Diplomat's protests—ultimately proven correct—that such a petition would be futile in view of the PRRB's limited jurisdiction; the PRRB did not suggest that Diplomat should pursue the exception route; and (3) the Secretary admitted for purposes of the previous suit that: "The Plaintiffs . . . for cost reporting periods after December 31, 1971, are required to file 'cost reports' using only the 'Combination Method' . . . ." (J.A. 74). We find that, in these circumstances, the possibility of exception relief does not bar Diplomat from challenging the substantive validity of the distinction at issue embodied in the 1972 regulations. *Cf. Phillips Petro. Co. v. FEA,* 435 F.Supp. 1239, 1248

(D.Del.1977), *aff'd sub nom. Standard Oil Co. v. DOE,* 596 F.2d 1029, 1039 (Em.App.1978).

29. The Secretary did not argue, but the court itself raised the question of why Diplomat did not challenge the 1972 regulations until it filed its action in 1975. For three reasons, we find that immaterial:

(1) There is no statutory provision allowing for direct review of the Secretary's Medicare regulations. *Cf.* Consumer Product Safety Act, 15 U.S.C. § 2060 (1976); Fair Packaging and Labeling Act, *id.* § 1455 (1976); Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 371(f) (1976).

(2) Diplomat could perhaps have brought an action in 1972 in the district court in this circuit, basing jurisdiction on § 10 of the APA, 5 U.S.C. §§ 701–06. *See Independent Broker-Dealers' Trade Ass'n v. SEC,* 142 U.S.App.D.C. 384, 388, 395, 442 F.2d 132, 136–43, *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971); *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 377–385, 424 F.2d 859, 865–73 (1970). The Supreme Court later held, however, that § 10 is not a jurisdictional statute. *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Diplomat could perhaps have asserted jurisdiction then under the federal question statute, 28 U.S.C. § 1331. *See AMA v. Weinberger,* 395 F.Supp. 515 (N.D. Ill.), *aff'd,* 522 F.2d 921 (7th Cir. 1975) (preliminary injunction granted in an action based on § 1331 challenging Medicare and Medicaid regulations; jurisdictional issue not discussed); *cf. Ass'n of Nat'l Advrs., Inc. v. FTC,* Nos. 79–1030 to 79–1033 (D.C.Cir. Oct. 2, 1979) (slip op. 15–16). But in 1975 *Weinberger v. Salfi,* 422 U.S. 749, 761, 95 S.Ct. 2457, 2464, 45 L.Ed.2d 522 (1975), held that the prohibition in § 205(h) of the Social Security Act, 42 U.S.C.

achieve the statutory policies Congress directs it to implement [30] and regulations must be validated if they are "reasonably related to the purposes of the enabling legislation," [31] the deference due an agency "cannot be allowed to slip into a judicial inertia." *Greater Boston Tele. Corp. v. FCC, supra* n.20, 143 U.S.App.D.C. at 393, 444 F.2d at 850, *quoting Volkswagenwerk Aktiengesellschaft v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). We are convinced that the reasonableness requirement was breached here. *Cf., Nat'l Ass'n of Food Chains, Inc. v. ICC, supra*, 175 U.S.App.D.C. at 353–56, 535 F.2d at 1315–18; *Portland Cement Ass'n v. Ruckelshaus, supra* n.20, 158 U.S.App.D.C. at 323–335, 486 F.2d at 390–402.[32]

## III. THE REMEDY FOR DIPLOMAT

The 1972 regulations have since been replaced by newer regulations effective February 20, 1979, which apply the Departmental Method to all providers. The Secretary, however, refused to apply the 1979 revision retroactively because of administrative inconvenience.

Where does this leave Diplomat? Its fiscal intermediary, Blue Cross of Northeastern Ohio, stipulated before the PRRB that the loss in reimbursable costs for the two-year period involved in this case, Diplomat's fiscal years 1972–73 and 1973–74, stemming from its ineligibility to use the Departmental Method was $56,302. J.A. 15. Diplomat may have additional claims for the following years, but we need not deal with them here or determine if there are any bars to Diplomat's reimbursement applications for those years. Nor are we in a position to say what, if any, further burden of proof Diplomat can be required by HEW to meet in order to make out its present claims.[33]

Because there is no statutory authority for direct review, because other possible jurisdictional grounds were subsequently eliminated by court decisions, and because of possible ripeness questions, Diplomat's failure to challenge the regulations earlier should not act as a bar to its present action.

30. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

31. *Thorpe v. Housing Authority*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969).

32. Because we decide this case based on the absence of a rational basis for the 1972 regulations, we pretermit whether the statement of basis and purpose of those regulations was sufficient under § 4 of the APA, 5 U.S.C. § 553 (1976).

33. Of course, we decide nothing about any potential claims of nursing homes similarly situated to Diplomat during the years in question. From the record it appears there were some 800 independent Medicare nursing home providers in the over-100-bed category. How many of these could have or would have used the Departmental Method is beyond the scope of this opinion. We note, however, that 58 percent of such institutions interviewed in the 1974 survey indicated they would have so chosen. J.A. 63.

§ 405(h), on actions under § 1331 against the United States "to recover on any claim arising under [Title II of the Act]" applied to an action challenging a denial of benefits under Title XVIII. Section 205(h) applies to Title XVIII, the Medicare statutes, "to the same extent as . . . [it is] applicable with respect to [Title II] . . . ," *id.* § 1395ii, thus *Salfi* alone arguably bars a suit under § 1331. Of course, the argument might have been made that § 205(h) applies only to claims arising under the statute and not to a direct challenge to regulations. In 1977 this court rejected that argument, however, finding that § 205(h) as interpreted by *Salfi* precludes a direct challenge to Medicare regulations because that would be an "action envisioning recovery on any claim emanating from Title [XVIII]." *Ass'n of Am. Med. Colleges v. Califano, supra* n.13, 186 U.S. App.D.C. at 276, 569 F.2d at 107. *Medical Colleges* also rejected the mandamus statute as providing a jurisdictional basis for direct challenges to Medicare regulations. *Id.* at 282–83, 569 F.2d at 113–14.

(3) Finally, in 1972 Diplomat may have been hard pressed to establish that it met the ripeness standards of *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–52, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and its two companion cases. The 1972 regulations required the Combination Method for nursing homes for "cost reporting periods starting after December 31, 1971." 20 C.F.R. § 405.452(c), 37 Fed.Reg. at 10355. Diplomat's fiscal year ends on July 31, Thus, not until Diplomat submitted its annual cost reports for 1972–73 sometime after July 31, 1973, and not until HEW evaluated them could Diplomat establish it had been harmed in the 1972 change in the regulations.

We remand the case to the district court with instructions to enter an appropriate order granting summary judgment to Diplomat on the issue of the invalidity of the regulations, and to take further action consistent with this opinion.

*Reversed and Remanded.*