**SAMARITAN HEALTH SERVICE, Plaintiff,**

v.

**Margaret HECKLER, Defendant.**

**Civ. A. No. 84–2840.**

United States District Court, District of Columbia.

Oct. 2, 1985.

Elissa G. Baly, Hopkins & Sutter, Washington, D.C., Albert C. Maule, Hopkins & Sutter, Chicago, Ill., for plaintiff.

Joseph E. Digenova, U.S. Atty., Royce C. Lamberth, Asst. U.S. Atty., Donald G. Kosin, Jr., Atty., Office of the General Counsel, Dept. of Health and Human Services, Washington, D.C., for defendant; Terry Coleman, Acting Gen. Counsel, Ann T. Hunsaker, Asst. Gen. Counsel, of counsel.

## MEMORANDUM

OBERDORFER, District Judge.

This Medicare reimbursement dispute comes before the Court on plaintiff's appeal from a decision by the Provider Reimbursement Review Board ("the Board"). The parties have filed cross motions for summary judgment, and the issues have been fully briefed and argued. This memorandum addresses those motions.

Plaintiff Samaritan Health Service ("Samaritan") owns and operates Good Samaritan Hospital and Desert Samaritan Hospital, short term, acute care hospitals located respectively in Phoenix, Arizona and Mesa, Arizona. Defendant Margaret Heckler is sued in her official capacity as Secretary of Health and Human Services. Plaintiff here claims that certain decisions made by the Board[1] in administrative proceedings pertaining to Good Samaritan and Desert Samaritan were not supported by substantial evidence; were arbitrary, capricious, and an abuse of discretion; and were violative of Samaritan's due process rights as guaranteed by the Fifth Amendment of the United States Constitution.

## Introduction

Under the Health Insurance for the Aged and Disabled Act ("the Medicare Act"), 42 U.S.C. § 1395 *et seq.* and implementing regulations, providers of health care services to Medicare beneficiaries are reimbursed by the government, generally through private organizations which act as "fiscal intermediaries." The Medicare Act authorizes the Secretary to contract with such fiscal intermediaries to reimburse providers. 42 U.S.C. § 1395h.

During the period in question,[2] providers such as Good Samaritan and Desert Samaritan were required by statute and regulation to submit "cost reports;"[3] the fiscal intermediaries would review, analyze, and, if necessary, audit the cost report to determine the amount of a provider's reimbursement. *See* 42 C.F.R. § 405.406 (1979). The fiscal intermediary would then issue a "notice of program reimbursement" setting forth the provider's Medicare reimbursement entitlements. 42 C.F.R. § 405.1803(a) (1979).

A provider who is dissatisfied with the fiscal intermediary's determination has a right to a hearing before the Board if the amount in controversy is $10,000 or more. *See* 42 U.S.C. § 1395oo (a); 42 C.F.R. § 405.1835 (1979). The Secretary is authorized to reverse, modify or affirm Board decisions; the Secretary's final decision (or the decision of the Board if the Secretary declines to review its holding) may in turn be appealed to the United States District Court. Under 42 U.S.C. § 1395oo (f), the

---

1. These decisions constitute final agency action as the Deputy Administrator of the Health Care Financing Administration ("HCFA"), acting under authority delegated by the Secretary, elected not to reverse, modify, or affirm them. The parties do not dispute that the Board's decisions are final agency action subject to appeal in this Court under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

2. The disputed cost years are 1977, 1978 and 1979. Starting with cost years beginning on or after October 1, 1983, the "Prospective Payment System," governed by 42 U.S.C. § 1395ww(d), has structured reimbursement for most hospitals.

3. Such cost reports would, *inter alia,* set out an "average cost per diem for routine patient services," which, when multiplied by the number of patient days attributable to Medicare beneficiaries, would constitute the principle component of the provider's reimbursement. *See* 42 C.F.R. § 405.452(b)(7) (1979).

agency's final action is reviewed under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.

This matter is before the Court on plaintiff's appeal from the Board's decision, left intact by the Secretary, in two administrative proceedings relating to Good Samaritan and Desert Samaritan. The Board decisions which plaintiff challenges followed hearings conducted before the Board on October 12, 13 and 14, 1983. In the first proceeding, pertaining to Good Samaritan Hospital, the Board considered Samaritan's appeal from reimbursement decisions by its fiscal intermediary, Blue Cross and Blue Shield Association of Arizona ("Blue Cross"), and resolved each of three issues in favor of Blue Cross and against Samaritan. In the second proceeding, pertaining to Desert Samaritan Hospital, the Board considered Samaritan's challenge to Blue Cross' reimbursement decision and resolved each of two issues in favor of Blue Cross and against Samaritan.[4] Samaritan claims here generally that the decisions reached by the Board were not supported by substantial evidence; were arbitrary, capricious and an abuse of discretion; and were violative of Samaritan's due process rights as guaranteed by the Fifth Amendment of the United States Constitution. Samaritan's more specific contentions and defendant's responses are examined below, addressing in turn each of the five issues raised in the Board proceedings.

## I.

The first issue is Good Samaritan's reclassification in its 1977, 1978 and 1979 cost reports of certain costs related to care of newborns. The fiscal intermediary, Blue Cross, on September 30, 1981 issued a notice of program reimbursement which rejected Good Samaritan's attempt to reclassify costs in the manner described below.[5] The Board upheld Blue Cross' treatment of these costs, and Samaritan here appeals the Board's decision.

### A.

Good Samaritan in 1977, 1978 and 1979 maintained three separate facilities for the care of newborn babies. Well babies—those who had normal deliveries and no post-natal complications—received care in the "Transitional Nursery." The "A–3 Nursery," a rooming-in arrangement that permitted mothers to be with their newborns, also was used for care of healthy newborns. Babies in the A–3 and Transitional nurseries received only custodial care, e.g., feeding, diapering and bathing. G.S.Ad.R. at 1041–45.

The second facility was the "Border Area," [6] which housed infants who had developed problems in the A–3 or Transitional nurseries, or who no longer required the high level of care afforded in the Intensive Care Unit. The infants in the Border Area were monitored with sophisticated diagnostic equipment and attended by a specialized staff. Id. at 1047–49.

The third facility was the Intensive Care Unit ("ICU"), which treated critically ill infants. The ICU featured advanced equipment and a highly specialized staff. Id. at 1049–53.

Good Samaritan also operated a Pediatric Unit to care for ill infants and children. Newborns were occasionally admitted to the Pediatric Wing if they developed prob-

---

4. In finding in Blue Cross' favor on these five issues, the Board affirmed the fiscal intermediary's denial of plaintiff's claimed reimbursements in several categories for fiscal years 1977, 1978 and 1979. The Board's decision became final agency action when the Deputy Administrator of HCFA, acting under authority delegated by the Secretary of Health and Human Services, elected to leave the Board's decisions intact.

5. Good Samaritan Administrative Record ("G.S. Ad.R.") at 2150. The effect of Blue Cross' decision, applied to Good Samaritan's 1977, 1978 and 1979 fiscal years (the 1977 and 1978 years were reopened) was to reduce Good Samaritan's reimbursements for those years by respectively $182,000, $141,000 and $96,000.

6. Samaritan in its pleadings referred to this area as the "Border Area," although certain of the transcripts of the proceedings before the Board suggest that the term was "boarder area."

lems after being sent home. The care provided infants in the Pediatric Ward was essentially the same as the care received by infants in the Border and ICU areas. *Id.* at 1055–58.

In 1975, Good Samaritan filed a cost report reclassifying the ICU and Border area days and costs as *pediatric* days and costs. *See id.* at 1776–77. It included these pediatric days and costs in its average cost per diem for purposes of Medicare reimbursement.[7] Good Samaritan also reclassified the A–3 nursery costs to the Transitional Nursery cost center in order to consolidate "routine nursery" costs. Good Samaritan determined these costs on the basis of revenues. Although Blue Cross did not question this methodology during cost reporting years 1975–78, Blue Cross on September 30, 1981 issued a notice of program reimbursement which rejected Good Samaritan's reclassification of these costs and its inclusion of them in calculating its average cost per diem. *Id.* at 0010.

### B.

The Secretary has promulgated regulations detailing the calculation of reimbursable costs. During the cost years at issue, the regulation that set forth the method for calculation of "average cost per diem for routine services" provided in pertinent part that that figure was "computed by dividing the total allowable inpatient cost for routine services (*excluding ... nursery costs*) by the total number of inpatient days of care (*excluding ... newborn days*)." 42 C.F.R. § 405.452(b)(7) (1979) (emphasis added).

Samaritan contends that Blue Cross and the Board err in relying on this provision to reject Samaritan's reclassification of its ICU and Border Area infant care costs and days as pediatric days and costs properly included in its average cost per diem and reimbursable as such. According to Samaritan, section 405.452(b)(7) excluded nursery costs from average per diem routine cost because "newborns do not receive any

routine care and therefore do not generate any routine costs. It would be unfair to have routine costs apportioned to them when they create none." *St. Mary of Nazareth Hospital Center v. Schweiker,* 718 F.2d 459, 468 (D.C.Cir.1983). Thus, according to Samaritan, nursery costs are *ordinarily* not "routine" (and reimbursable as such) because they are associated with a lower level of services than is the norm for a hospital.

Samaritan contends, however, that the regulations create an implied exception to section 405.452(b)(7)'s exclusion of nursery costs. Section 405.452(d)(2) (1979) defines "routine services" to mean "the regular room, dietary and nursing services, minor medical and surgical supplies, and the use of equipment and facilities for which a separate charge is not customarily made." Samaritan reasons that the services provided to the newborns in the Border and ICU areas, involving a higher level of care than services provided to newborns in the A–3 and Transitional Nurseries,[8] met this definition and, therefore, were "routine services" rather than usual nursery services. Samaritan argues that those costs thus were properly included in computing Good Samaritan's average per diem costs.

In support of this proposition, Samaritan refers to the Secretary's Provider Reimbursement Manual, which gives instructions for completing cost reporting forms. The statistics that are used to compute the average cost per diem for the routine cost component of the Provider cost are requested on lines 4, 5 and 6 of the cost reporting forms. The Secretary advises:

> An infant remaining in the hospital after the mother is discharged and not occupying a newborn bed in the nursery, or an infant delivered outside the hospital and later admitted to the hospital but not occupying a newborn bed in the nursery, or an infant admitted or transferred out of the nursery for an illness should be

---

**7.** *See supra* note 3.

**8.** *See supra* at 716–17.

included in the total inpatient days reported on lines 4 and 6.

Provider Reimbursement Manual II, § 304.-3, Medicare and Medicaid Guide (CCH) ¶ 9304C.

The Secretary responds that the "regulations make no distinction between the levels of care [provided] *in a nursery.*" G.S. Ad.R. at 0012 (emphasis added). The Secretary notes that 42 C.F.R. § 405.452(b)(7) flatly excluded "nursery" care from the per diem calculations and further notes that the areas in question were identified *by plaintiff* as "nursery" units.[9] *See* G.S. Ad.R. at 0728–0735. Moreover, the Secretary argues, the State of Arizona treats the facilities at issue as nurseries for state licensing purposes.[10]

### C.

■ Samaritan, as the provider, bears the burden of proof in actions brought under 42 U.S.C. § 1395oo (f), *Diplomat Lakewood Inc. v. Harris,* 613 F.2d 1009, 1018 (D.C.Cir.1979). Samaritan must, in order to prevail, demonstrate that the agency action challenged was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or unsupported by substantial evidence in the record as a whole. *Home Health Services of the U.S., Inc. v. Schweiker,* 683 F.2d 353, 356 (11th Cir.1982). If the agency action is not appropriately characterized in that fashion, "the reviewing court cannot reverse the findings of the agency on the basis that it would have decided the case differently." *Id.* at 357. Similarly, "[a] reviewing court may not set aside the agency's interpretation merely because another interpretation ... seems better, so long as the agency's interpretation is within the range of reasonable meanings that the words of the regulation admit." *Psychiatric Institute of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812, 814 (D.C.Cir.1981). *See also Diplomat Lakewood, supra,* 613 F.2d at 1018 ("We would be obliged to affirm the decision below if we could find a rational basis in the record for the Secretary's action").

■ On the issue of the reclassification of costs, Samaritan has not sustained its burden of showing that the Secretary's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence. 42 C.F.R. § 405.452(b)(7) by its plain terms excluded "nursery costs" from the per diem calculation and it is uncontroverted that plaintiff *itself* identified the areas in question as "nursery" units. *See* G.S.Ad.R. at 0722–0735. Although plaintiff might prefer to introduce a multi-level definition of the term "nursery," the Secretary has not done so,[11] and "the agency's

9. Defendant also contends that even if plaintiff's reclassification were appropriate, plaintiff did not adequately document its nursery costs so as to permit reimbursement.

10. Although, for the reasons stated below, the Secretary is entitled to summary judgment on the issue of the nursery cost reclassification, it is at the outset recognized that defendant's state licensing argument is unpersuasive. The Medicare statute is inherently federal, and its provisions do not suggest that its operative terms are to be defined by varying practices among states. If the Secretary were to adhere to state regulations, she might find herself paying excessive reimbursements to states that were able to design classifications to take advantage of applicable Medicare definitions. The Board itself has in the past implicitly rejected state licensing as a basis for determining the validity of a pediatric classification. *See Rochester General Hospital v. Blue Cross/Blue Shield,* [1984 Transfer Binder]

Medicare and Medicaid Guide (CCH) ¶ 33,452 (No. 83–D140 September 9, 1983); *aff'd,* HFCA Adm. Dec. ¶ 33,621; *rev'd* No. 84–0056T (W.D. N.Y. April 25, 1985).

11. As the Board noted in its decision, these "regulations make no distinction between the levels of care [provided] in a nursery." G.S. Ad.R. at 0012. Although the Secretary's Provider Reimbursement Manual provision (quoted by plaintiff and discussed *supra* at 717) is potentially inconsistent with this conclusion, the manual instruction employs the term "nursery" without defining it and by its terms indicates that an infant receiving care in a "nursery" area shall be included in calculation of newborn inpatient days and *not* in the calculation of average cost per diem. As plaintiff itself identifies the areas in question as "nursery" units, its contention that ¶ 9304C permits differentiation among classes of infants is insufficient to shield plaintiff from 42 C.F.R. § 405.452(b)(7)'s plain

interpretation is within the range of reasonable meanings that the words of the regulation admit." *Psychiatric Institute, supra,* 669 F.2d at 814.[12]

### D.

■ Plaintiff argues, however, that the Secretary is estopped from disallowing Good Samaritan's pediatric reclassification. Plaintiff claims that Blue Cross allowed such reclassification in earlier years, that Good Samaritan relied on Blue Cross' determination to its detriment, and that the Secretary improperly changed her position. Plaintiff's argument on this issue is unpersuasive. As the Supreme Court noted in *Heckler v. Community Health Services of Crawford County,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984):

> As a recipient of public funds well acquainted with the role of a fiscal intermediary, respondent knew [that its intermediary] only acted as a conduit; ... The relevant statute, regulations, and reimbursement manual, with which respondent should have been and was acquainted, made that perfectly clear. Yet respondent made no attempt to have the question resolved by [the Secretary]. It was satisfied with the policy judgment of a mere conduit.

*Id.* 104 S.Ct. at 2226 (note omitted). *Community Services* clarifies that plaintiff cannot rely on the determinations of its intermediary as grounds for an estoppel argument against the Secretary.

There being no issue of material fact, an accompanying order will grant defendant's motion for summary judgment on this issue and deny plaintiff's motion. In view of the grounds on which this decision is based, it is unnecessary to reach the question whether plaintiff's documentation of its nursing costs was adequate to support reimbursement *if* its reclassification was legal.

### II.

■ The second issue to be addressed is Good Samaritan's treatment of fees paid to "on call" anesthesiologists and surgeons in its cost report for 1979. Good Samaritan in 1979 paid certain anesthesiologists $200 per 12-hour shift and paid certain surgeons $400 per 24-hour shift to "stand by" to render emergency trauma services.[13] In its cost report for 1979, Good Samaritan claimed these "on-call" expenses as "allowable costs."[14] Blue Cross, after auditing Good Samaritan's 1979 cost report, rejected Good Samaritan's treatment of the fees paid to the on-call physicians, resulting in a reimbursement reduction of approximately $28,000. The Board affirmed Blue Cross' decision on this issue and Samaritan here appeals the Board's decision.

### A.

The Secretary's Provider Reimbursement Manual, HIM–15, Medicare and Medicaid Guide (CCH) ¶ 5889, sets at section 2109 the standard for reimbursement of emergency room standby costs. The version of section 2109.1 in force during the cost years in question expressly provided that:

---

12. The Court notes but is not persuaded by plaintiff's citation of *Rochester General Hospital v. Heckler,* No. 84–0056T (W.D.N.Y. April 25, 1985).

Plaintiff apparently did not attempt to designate the infant ICU as a "Special Care Unit" under (the 1977 version of) HIM–15 § 2202.7 for Medicare reimbursement purposes. *See* § 2202.7(A): ("NOTE: If a neonatal unit qualifies as an SCU, the days are considered SCU days rather than nursery days (*see* Part II, Chapter 3, § 304.2, lines 4, 5, 6, paragraph 5). A regular well-baby nursery may not be considered an SCU.")

13. Under this arrangement, Good Samaritan paid the physicians to be available during the on-duty and on-call periods; the physicians also billed the individual patients whom they treated in the trauma center.

14. Under the first step of the two-step process detailed in the regulations. *See* 42 C.F.R. § 405.401, *et seq. See also* 42 U.S.C. § 1395x(v)(1)(A).

[t]he unmet guarantee,[15] as described in this section, is the *only* type of financial arrangement in which the Medicare program will recognize provider standby costs for payments made to emergency room physicians. Since the purpose of this section is to extend program reimbursement to those financial arrangements which meet all the conditions established in § 2109.2, the program does not recognize other types of contractual arrangements which fail to consider these requirements in determining the provider's allowable costs. The program does not recognize, as a reimbursable cost, any amount relating to unmet guarantee payments for physicians' services in provider settings other than as described in this section.

*Id.* at § 2109.1 (emphasis in original).[16]

Notwithstanding the plain language of section 2109, Samaritan contends that section 2108 [17] should instead govern allowability of its "on call" trauma physician fees.[18] In so contending, Samaritan relies on certain previous Board decisions and the statement by an HCFA administrator in a memorandum [19] relating to what Samaritan describes as an analogous case:

**15.** The "unmet guarantee" rule was designed to account for the distinction between Medicare Part A (Provider) and Part B (Physician) reimbursement. An on-call physician may be providing Part B care while "on-call" for a Part A provider. To prevent physicians from being paid twice for the same time commitment, the Secretary in the 1978 version of § 2109 required the provider to guarantee the physician who would be "standing by" a minimum level of compensation. If the physician "on call" *was* called to provide services to a patient and billed the patient for those services, the provider only incurred standby costs to the extent that the physician's billings did not meet the guaranteed minimum. If the physician's Part B charges fell below the minimum, the provider made up the difference and Medicare would treat that cost as allowable provider cost.

**16.** HIM–15 § 2109 was modified by the Secretary in May of 1985. *See* Medicare and Medicaid Guide (CCH) ¶ 5889. The earlier version quoted above controls the period at issue.

**17.** Which governs reimbursement to hospitals for services provided by provider-based physicians under fixed compensation arrangements,

The provisions of Section 2109 would not be applicable to the Scottsdale Memorial Hospital arrangement [which Samaritan characterizes as "almost identical" to its own arrangement] you described. Section 2109 applies only to minimum guarantee agreements.... The Scottsdale arrangement cannot be considered to be a minimum guarantee agreement because the hospital's liability is not affected by the amount of the physician charges. It is a fixed compensation component and should be assessed against the hospital-based physician guidelines in section 2108ff.

G.S.Ad.R. at 1981.[20]

The Secretary, in response, cites the text of section 2109 and excerpts from several other memoranda present in the administrative record. Generally, the Secretary contends that section 2109 properly applies to standby costs and that section 2108 would not in any event justify Medicare reimbursement for fixed fees unrelated to billing charges unless some identifiable provider-component services were included in the fixed fee (which, she contends, is not true here).

**18.** Plaintiff does not dispute that it has not satisfied the requirements of § 2109.2 if that section does apply.

**19.** *See also* Memorandum from the Acting Director of Bureau of Program Policy to the Dallas Regional Medicare Director, June 8, 1985, G.S.Ad.R. at 1971–74.

**20.** It is noted initially that this excerpt from the memorandum indicates that claims for reimbursement for fixed compensation to provider-based physicians would be *analyzed* (not necessarily paid) under § 2108. The Secretary contends that Samaritan's documentation of how the trauma physicians spent their time is insufficient to permit reimbursement as reasonable cost under § 2108 *if* it were determined that § 2108 should be applied. Samaritan disputes the Secretary's assertion that its documentation was inadequate. As discussed below, the Court concludes that § 2109 was properly applied; thus it is unnecessary to reach the question of the adequacy of Samaritan's documentation.

### B.

Once again, plaintiff has not sustained its burden of demonstrating that the Secretary's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence.

The Secretary has broad authority under the Medicare Act to promulgate regulations defining the reasonable cost of providing services to Medicare beneficiaries. 42 U.S.C. § 1395x(v)(1)(A). Although that section provides that the Secretary shall "take into account both direct and indirect costs of providers of services," it further directs that the regulations should "exclud[e] therefrom any costs, *including standby costs*, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services." *Id.* (emphasis added). Pertinent regulatory provisions mandate that:

> The determination of reasonable cost of services must be based on cost *related to the care* of beneficiaries of title XVIII of the Act. Reasonable cost includes all *necessary and proper* expenses incurred in rendering services.... It includes ... normal standby costs. However, where the provider's operating costs include amounts not related to patient care ... or ... items or services substantially in excess of or more expensive than those generally considered *necessary for the provision of needed health services*.... Such amounts will not be allowable.

42 C.F.R. § 405.451(c)(3) (1979) (emphasis added).

According to the Secretary, Section 2109's unmet guarantee system is designed to insure that only necessary and proper standby costs will be incurred while simultaneously protecting against double payment for services rendered by physicians. The controlling version of section 2109 stated in plain terms that "[t]he unmet guarantee ... is the *only* type of financial arrangement in which the Medicare program will recognize provider standby costs for payments made to emergency room physicians," and Samaritan has not attempted to argue that it satisfied section 2109's requirements. As "[a] reviewing court may not set aside the agency's interpretation merely because another interpretation ... seems better, so long as the agency's interpretation is within the range of reasonable meanings that the words of the regulation admit," [21] the Secretary's decision on this issue must be upheld.

Although Samaritan's citation to the statement by an HFCA administrator does suggest the possible application of section 2108 analysis to emergency room fixed fee arrangements, *see supra* at 14, that suggestion is contradicted by the explicit language of section 2109. As discussed above, the controlling version of section 2109 stated that "[t]he unmet guarantee ... is the *only* type of financial arrangement in which the Medicare program will recognize provider standby costs for payments to emergency room physicians." The Secretary points to other memoranda present in the administrative record which support her interpretation. In one such memorandum, it is unequivocally stated that "[t]he only type of physician standby costs which are allowable are those which meet the limited situations described in section 2109ff of the Provider Reimbursement Manual (PRM)." [22]

---

**21.** *Psychiatric Institute, supra,* 669 F.2d at 814. It is, of course, recognized that the provisions contained in the Secretary's Provider Reimbursement Manual are not regulations, but guidelines interpreting regulations promulgated pursuant to the Medicare Act. The Secretary's interpretation of the regulations as expressed in her Provider Reimbursement Manual is nonetheless entitled to substantial deference. *See Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) ("[R]ulings, interpretations and opinions of the [responsible

agency] ..., while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance").

**22.** Memorandum from the Director, Division of Provider and Medical Service Policy, to the Chicago Regional Medicare Director, September 19, 1977. G.S.Ad.R. at 1975.

Samaritan's citation of 42 C.F.R. § 405.-480(a)(2) (1984) is not persuasive that a differ-

Finally, the cases cited by Samaritan in support of its claim that section 2108 should instead govern the costs at issue are not persuasive.[23] The Secretary notes that the decisions of the Board are not by regulation made binding except between the parties to the hearing before the Board, *see* 42 C.F.R. § 405.1871(b) (1984), and further points out that these cases were not part of the record before the Board. In any event, the two cases cited by plaintiff,[24] like the excerpts from HCFA memorandum cited by plaintiff, support a result contradicted by the plain language of the controlling version of § 2109. In light of that plain language, the Secretary's decision to apply § 2109 must be upheld.

As it is concluded that the Secretary properly applied section 2109 in analyzing Samaritan's claim for reimbursement of the on call costs, it is unnecessary to resolve the question of whether Samaritan's documentation of those costs was sufficient to permit reimbursement under section 2108.[25] As section 2109 properly applies and Samaritan does not claim that it has satisfied the requirements of that section, an accompanying order will grant the Secretary's motion for summary judgment on this issue.

### III.

■ The third issue to be addressed is Samaritan's claims for reimbursement of costs from the "Definitive Observation Units" operated by both Good Samaritan and Desert Samaritan.[26] Blue Cross, after

---

ent result is required on this issue. Revisions to that section, issued March 2, 1983, indicated that physicians' "reasonable availability services furnished for emergency rooms ..." could be classified as provider-component costs. Samaritan itself recognized that the new regulation was not in effect for the cost years at issue, and there is no indication that the regulation was intended to have retroactive effect. *See* 48 Fed. Reg. 8902 (March 2, 1983). More importantly, this provision contains nothing that suggests that the requirements of the controlling version of HIM–15 § 2109 would not have to be met before those standby costs would be reimbursable under Part A as provider-component costs. To the contrary, HCFA, in its notice of final rule and comment period relating to 42 C.F.R. Part 405, stated as follows:

> The expense attributable to [physician availability services] is currently reimbursable as an allowable cost only when it is incurred by a provider in connection with an emergency room agreement that meets very specific criteria. Our proposed rule continues this policy....
> ... "Availability services" are general services related to expectations of need by unspecified patients, such as provided by emergency rooms. Such availability services are reimbursable on a reasonable cost basis, *but only when the costs of the services are incurred in connection with an emergency room agreement that meets certain specific criteria.*

48 Fed.Reg. 8902, 8908 (March 2, 1983) (emphasis added). This excerpt supports the conclusion that the Secretary did not act in an arbitrary or capricious fashion in determining that section 2109 (rather than section 2108) properly applied, and 42 C.F.R. § 405.480(a)(2) does not avail Samaritan.

**23.** Plaintiff's one sentence suggestion that "[s]ection 2109 is further invalid because it consti-

tutes a substantive rule and was not promulgated under the Notice and comment provisions of the APA," Plaintiff's Memorandum in Opposition to the Secretary's Motion for Summary Judgment at 23, is similarly without merit.

**24.** *See D.M. Cogdel Memorial Hospital v. Blue Cross* [1982 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 31,883 (No. 82–D63 March 3, 1982) and *Community Hospital v. Blue Cross* [1983 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 32,293 (No. 82–D139 Sept. 23, 1982).

**25.** Fees will not be reimbursable under Part A without an identifiable provider component. One memorandum present in the administrative record indicates that when a physician receives a fixed fee which is not affected by charges actually billed:

> the usual hospital-based physician rules would be applied ... and the intermediary must assess the reasonableness of the fixed rate compensation in light of the provider services the physician actually performs. *If the physician performs no identifiable provider services, the entire fixed rate amount would be denied.*

Memorandum from the Acting Director of the Bureau of Program Policy to the Dallas Regional Medicare Director, June 8, 1980. G.S.Ad.R. at 1972 (emphasis added).

**26.** This issue was considered both in the administrative proceeding involving Good Samaritan Hospital and in the administrative proceeding pertaining to Desert Samaritan. Consequently, this last issue from the Good Samaritan proceeding and the first issue from the Desert Samaritan proceeding are considered together in this section.

auditing the 1977, 1978, and 1979 cost reports, issued notices of program reimbursement that rejected Good Samaritan's and Desert Samaritan's · treatment of these costs. The result was a reimbursement reduction for Good Samaritan of $58,000 in 1977, $87,000 in 1978, and $105,000 in 1977. G.S.Ad.R. at 0008. The reimbursement reduction for Desert Samaritan was $48,000 in 1977, $73,000 in 1978, and $82,000 in 1979. Desert Samaritan Administrative Record ("D.S.Ad.R.") at 0009. The Board affirmed Blue Cross' decision on this issue and Samaritan here appeals the Board's decision.

it was agreed that (1) the DOU's were in a hospital; (2) both hospitals had specific written policies for their DOU's; (3) the DOU's in both hospitals were physically identifiable as separate from general patient care areas; and (4) care required in each DOU was extraordinary.[27] Based on 42 C.F.R. § 405.452(d)(10), the stipulation left for the Board the question of whether care was provided in the DOU's "on a concentrated and continuous basis." The Board affirmed Blue Cross' conclusion that care was not provided on a concentrated and continuous basis [28] and Samaritan here appeals the Board's decision.

### A.

Good Samaritan and Desert Samaritan in 1977, 1978 and 1979 operated "Definitive Observation Units" ("DOU's"). A DOU is a sub-intensive care unit designed to provide sophisticated treatment for critically ill patients without subjecting them to negative environmental factors commonly found in the Intensive Care Unit ("ICU") and the Coronary Care Unit ("CCU"). The DOU's consisted of semi-private rooms intended to facilitate rehabilitation of cardiac patients; they also featured high levels of monitoring intervention care, although the nurse-to-patient ratios fell in between the ratios for ICU and routine care.

Before the Board hearings began, Blue Cross entered into stipulations with Good Samaritan and Desert Samaritan in which

### B.

Samaritan argues that, contrary to the Board's decision, the care provided in its DOU's *was* "on a concentrated and continuous basis" that met the requirements of 42 C.F.R. § 405.452(d)(10). Samaritan contends that (1) the stipulation entered into by the fiscal intermediary and the hospitals stated that the care was "extraordinary;" (2) the Medicare regulations do not define the phrase "on a concentrated and continuous basis" in a manner that would preclude Samaritan's claims; (3) the Board's analysis and reliance on nursing statistics was incomplete and erroneous; and (4) Blue Cross and the Board erred by "retroactively" applying Section 2202.7 of the Provider Reimbursement Manual ("HIM–15").[29]

27. *See* G.S.Ad.R. at 1258; Samaritan's Statement of Material Facts in Support of Its Motion for Summary Judgment at 33.

　　42 C.F.R. § 405.452(d)(10) (1979) (emphasis added) provided as follows during the cost years in issue:

　　*Intensive Care Units, coronary care units, and other special care in-patient hospital units.* To be considered an intensive care unit, coronary care unit, or other special care in-patient hospital unit, the unit must be in a hospital, *must be one in which the care required is extraordinary and on a concentrated and continuous basis* and must be physically identifiable as separate from general patient care areas. There shall be specific written policies for each of such designated units which include, but are not limited to burn, coronary care, pulmonary care, trauma, and intensive care units but exclude post-operative recovery

rooms, post-anethesia recovery rooms, or maternity labor rooms.

This regulation has been revised, *see* 42 C.F.R. § 405.452(d)(2) (1984), but the cost reporting years at issue are controlled by the quoted provision.

28. The effect of this decision was to reject Samaritan's claim that DOU costs were properly reimbursed as costs incurred through operation of intensive care units, coronary care units and other special care in-patient hospital units. The monetary reimbursement reductions which resulted are described *supra* at 723.

29. Section 2202.7, as amended in June, 1977, indicated that units would not qualify as special care units unless hours of nursing service per patient day are equivalent to those provided in an "established special care unit." *See infra* note 31.

The Secretary contends that the applicable Medicare regulation affords "special care unit" status only to those units which provide care equivalent to a hospital's highest level of care. The Secretary further contends that § 2202.7's definition of "special care unit," based in part on nursing services, has been upheld in this Circuit.[30] According to the Secretary, that definition precludes classification of Samaritan's DOU's as "special care units" once Samaritan's nurse-patient ratios are examined.

## C.

On this issue, as on the issues discussed above, Samaritan has not sustained its burden of demonstrating that the Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence. Substantial evidence in the record supports the Secretary's conclusion that the level of care provided in the DOU's did not rise to the level provided in the hospitals' ICU's or CCU's and, accordingly, the DOU units were not appropriately designated as "special care units" for purposes of cost reimbursement.

Although Blue Cross and Samaritan did, prior to the Board proceedings, stipulate that the care required in the DOU's was "extraordinary," 42 C.F.R. § 405.452(d)(10) (1979) (as worded during the cost years at issue) further required that such care be provided *"on a concentrated and continuous basis."* (Emphasis added). Substantial evidence in the record supports the Board's conclusion that the levels of care in the DOU's did not satisfy that requirement as interpreted by the Secretary and this Circuit.

The Secretary's Provider Reimbursement Manual, HIM–15, at section 2202.7 clearly indicates that nurse-patient ratios are appropriately examined to determine whether units such as Samaritan's DOU's should be accorded "special care unit" status for reimbursement purposes.[31] That section further suggests that if patients are generally transferred *to* the unit in question *from* an established special care unit (as appears to have been the case at least with respect to Desert Samaritan), the unit in question would generally not qualify as an SCU.

The record clarifies that the level of care in the DOU's exceeded that in routine care units; it is undisputed, however, that the levels of care did not rise to the levels found in the ICU's and CCU's.[32] Further-

---

**30.** *See Psychiatric Institute of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812, 814 (D.C.Cir. 1981).

**31.** The version of section 2202.7 controlling the cost years in question (§ 2202.7 as amended June 1977) stated in pertinent part that:

> [t]here may ... be cases where a unit is not easily identified as a subintensive or special care unit without further study. In such cases, a review of the written policies of the various units will indicate whether a unit is or is not providing care as defined in paragraph A. If the intermediary determines that such a unit meets the requirements of paragraph A above, then the unit will qualify as a special care unit.
>
> For example, one indication of whether the unit in question meets the requirements specified in § 2202.7A2 is the extent of nursing services provided in the unit. *If the hours of nursing service per patient day are less than the hours of nursing services provided in an established special care unit, such as an ICU or CCU in that hospital ... then the unit in question would generally not qualify as a special care unit....*

Another example is *where the patients in the unit in question are generally transferred there from a qualified special care unit after their condition has improved.* This would indicate that the intensity of care required is less than needed to qualify in A2 above.
HIM–15, § 2202.7(B) (as amended June, 1977).

**32.** Samaritan in its Statement of Points and Authorities in Support of its Motion for Summary Judgment summarized the nurse-patient ratios in Good Samaritan Hospital and Desert Samaritan Hospital in 1979:

| | Desert Samaritan | Good Samaritan |
|---|---|---|
| Routine | 1:4.4 | 1:3.7 |
| DOU | 1:2.2 | 1:2.4 |
| CCU | 1:1.6 | 1:1.2 |
| ICU | 1:1.4 | 1:1.1 |

Plaintiff's Statement of Points and Authorities in Support of its Motion for Summary Judgment at 31.

Our Court of Appeals has approved the evaluation of such statistics in determining whether a unit will qualify as a special care unit for purposes of Medicare reimbursement. *See Psychiatric Institute, supra,* 669 F.2d at 814.

more, Desert Samaritan had a written policy which provided that: "[a]dmissions to Intermediate Care Unit (DOU) shall be from ICU or CCU for patients requiring a *lesser* degree of intensive care than is available in the units, but shall require more care than is available on the general services." D.S.Ad.R. at 0012 (emphasis added). In short, the record substantially supports the Secretary's conclusions that, based on nurse-patient ratios and patient transfer policies, the DOU's were not providing the "concentrated and continuous care" required for designation as a special care unit.

Our Court of Appeals recently upheld the Secretary's determination in a case very similar to this one. In particular, the Court noted:

> The Secretary found that Villa View's CCTU and Los Alamitos' PCU were not sufficiently similar to those hospitals' Intensive Care Units to be considered special care units. Those findings are supported by substantial evidence. The evidence shows that many patients were transferred to the PCU and CCTU from the hospitals' Intensive Care Units after their conditions had improved. Moreover the Intensive Care Units in both hospi-

tals had considerable higher staffing levels than the units at issue here. The evidence supports the finding that the disputed units are not "similar" to the Intensive Care Units in terms of the "extraordinary," "concentrated" and "continuous" nature of the care" which each provided.[33]

Recalling once again that "[a] reviewing court may not set aside the agency's interpretation merely because another interpretation ... seems better, so long as the agency interpretation is within the range of reasonable meanings that the words of the regulation admit," *Psychiatric Institute, supra,* 669 F.2d at 814, the Secretary's decision on this issue must be upheld. The evidence in the record clearly supports the Board's determination and this Circuit has recently affirmed her application of Section 2202.7's standards [34] in making such determinations.[35]

## IV.

█ The final issue before the Court is Desert Samaritan's efforts to combine for Medicare accounting purposes certain of its ancillary costs [36] and charges and those of

---

**33.** *Villa View Community Hospital, Inc. v. Heckler,* 728 F.2d 539, 542 (D.C.Cir.1984) (per curiam). *See also Psychiatric Institute of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812, 813 (D.C.Cir.1981):

> The basic statutory provisions authorizing such a regulation [paying for nursing care] do not direct the Secretary to distinguish between the two classes of hospital care, see 42 U.S.C. §§ 1302, 1395x(v)(1)(A) (1976), and for the first five years of its operation the Medicare program recognized only one class of care for purposes of reimbursement. Thus the Special Care Unit regulation depended entirely on the Secretary's judgment that recognizing two classes of hospital care would best further the purposes of the Medicare program, and *the initial decision where to draw the line was for the Secretary alone.*
> (Emphasis added).

**34.** The Court of Appeals affirmation of section 2202.7 in *Psychiatric Institute, supra,* undercuts Samaritan's argument that the Secretary erroneously "retroactively" applied that section's provisions. In that case, as here, section 2202.7 had not been issued during the cost year at issue (there 1975) and the Court of Appeals none-

theless upheld its application. Additionally, as the Secretary notes in her Memorandum, section 2202.7's formal interpretation of the special care unit regulation was issued in June, 1977—well in advance of the time that Good Samaritan and Desert Samaritan had to file their cost reports for that cost year. Consequently, the hospitals were formally on notice of the Secretary's interpretation in time to act on that interpretation if they so desired.

**35.** *Greater Southeast Community Hospital v. Heckler,* 602 F.Supp. 764 (D.D.C.1985) does not require a different result. That case is distinguishable from the case here in that the Court in *Southeast Community Hospital* supported its conclusion in part with the fact that "[n]urse/patient ratios were almost identical" in the disputed units and established special care units. *Id.* at 766. Here the statistics support the conclusion that there are more significant differences in nursing intensity.

**36.** Ancillary areas are such areas as X-ray rooms, emergency rooms, laboratories, etc. Services provided in these areas generally result in separate charges.

the East Valley Clinic, a facility located 18 miles from Desert Samaritan. Blue Cross rejected Desert Samaritan's treatment of these expenses, resulting in a reimbursement reduction of $5,000 in 1978 and $6,000 in 1979. D.S.Ad.R. at 0010. The Board affirmed with minor modification[37] Blue Cross' treatment of these expenses and Samaritan here appeals that decision.

### A.

East Valley Clinic, located about eighteen miles east of Desert Samaritan Hospital, began operation as a free standing emergency clinic in July, 1978. Desert Samaritan provided medical, technical and business personnel to operate the clinic. The record establishes that East Valley was a half-hour's drive from Desert Samaritan, *id.* at 0578; that it had its own administrative director, *id.* at 0577; that it did its own billing of patients' insurance companies, *id.* at 0582; and that emergency room physicians working at East Valley have separate contractual arrangements with East Valley, *id.* at 0622. The record also establishes that East Valley charged lower prices than Desert Samaritan for the same ancillary services during the cost years at issue. *Id.* at 0013, 0617–18.

In Desert Samaritan's 1978 and 1979 cost reports, it combined certain of its ancillary costs and charges with those of East Valley in calculating its Medicare reimbursement claims. Blue Cross recalculated Desert Samaritan's reimbursements, basing its calculation on *separate* ancillary cost centers for Desert Samaritan and East Valley. The result was a reimbursement reduction for Desert Samaritan of $5,000 in 1978 and $6,000 in 1979.

### B.

Samaritan contends that the Board's decision was not supported by substantial evidence in the record, as "[n]o studies or other factual information was presented to support the conclusion that combining the costs of East Valley with those of the hospital would yield an inaccurate result." Plaintiff's Statement of Points and Authorities in Support of Its Motion for Summary Judgment at 38. Samaritan further contends that "the record is devoid of evidence sufficient to establish that either accounting method is more accurate than the other," *ibid.*, and that the Secretary's decision must therefore be reversed as arbitrary, capricious, an abuse of discretion and not supported by substantial evidence.

The Secretary responds that it was necessary to treat East Valley as a separate cost center to prevent "inequitable apportionment of costs to the program." The Secretary contends that Section 2203, HIM–15,[38] together with the evidence that East Valley and Desert Samaritan had different charging practices, necessitated separation of East Valley for Medicare accounting purposes.

### C.

Again, Samaritan has failed to establish that the Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence.

Samaritan does not dispute that Section 2203, HIM–15, requires that charges in a given cost center be uniformly applied to all patients, and the record clarifies that charges at East Valley were lower than charges for the same services at Desert Samaritan. D.S.Ad.R. at 0617–18; 0631. Based on this evidence in the record, the Board concluded that:

> combining the costs of the East Valley facility with those of the hospital and then attempting to apportion them to ser-

---

**37.** The Board additionally determined that charges for services rendered at East Valley to patients who were later transferred to Desert Samaritan's emergency room should be classified as East Valley charges and subtracted from Desert Samaritan's inpatient emergency room charges. D.S.Ad.R. at 0013.

**38.** Section 2203, Medicare and Medicaid Guide (CCH) ¶ 6153, provides in pertinent part that charges in a given ancillary cost center will only be allowable "so long as the [charging] practice is followed consistently."

vices rendered separately to patients at each facility on the basis of those different charges that bear no consistent relationship to cost would yield an inaccurate result contrary to the statutory and regulatory provisions.[39]

Recalling once again that "the reviewing court cannot reverse the agency on the basis that it would have decided the case differently," *Home Health Services, supra,* 683 F.2d at 357, the Secretary's decision on this issue as well must be upheld. "A reviewing court may not set aside the agency's interpretation merely because another interpretation ... seems better, so long as the agency's interpretation is within the range of reasonable meanings that the words of the regulation admit." *Psychiatric Institute, supra,* 669 F.2d at 814. Here undisputed evidence in the record indicates that East Valley's and Desert Samaritan's charges for similar services differed; that evidence supports the Secretary's application of section 2203, HIM–15, in rejecting Desert Samaritan's attempt to consolidate these costs of East Valley and Desert Samaritan for Medicare accounting purposes.

For the reasons stated above, an accompanying order will grant the Secretary's motion for summary judgment and deny Samaritan's summary judgment motion.

## ORDER

For the reasons stated in a Memorandum which accompanies this order, it is this 2nd day of October, 1985, hereby

ORDERED: that plaintiff's motion for summary judgment be, and it hereby is, DENIED; and it is further

ORDERED: that defendant's motion for summary judgment be, and it hereby is GRANTED, and that the above entitled cause be, and it hereby is, DISMISSED.

---

39. D.S.Ad.R. at 0013. The Board further explained that
   [t]o determine the costs of services rendered to beneficiaries, costs of each revenue-producing cost center must be apportioned, pursuant to 42 C.F.R. § 405.452, on the consistent basis of the ratio of beneficiary charges for each

service to total charges for that service. The combining of the charges and the costs of ancillary services of the East Valley facility with those of the hospital [would] not achieve that goal.
D.S.Ad.R. at 0013.